UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| Plaintiff, | § | |
| v. | § | No. 6:14-cr-0035 MHS-JDL |
| CARLOS ALBERTO ORTIZ-MACIAS, | § | JURY DEMANDED |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's Motion to Suppress Evidence. (Doc. No. 268.) The government has filed a response in opposition. (Doc. No. 272.) On January 21, 2016, the Court held a hearing on Defendant's Motion to Suppress Evidence. Having considered the evidence presented, the Court **DENIES** Defendant's Motion (Doc. No. 268).

**FACTUAL BACKGROUND AND EVIDENCE PRESENTED**

Defendant is charged in this matter with a violation of 21 U.S.C.§ 846 and 18 U.S.C. § 2, conspiracy to distribute and possess with intent to distribute methamphetamine and aiding and abetting a Schedule II controlled substance. (Doc. No. 251.)

In the summer of 2013, the Texas Department of Public Safety ("DPS") was conducting surveillance of the residence of Sergio Urbina with an installed pole camera pursuant to an ongoing investigation. (Tr. at 10:11-21.) During the hearing, the government presented evidence of the surveillance clips from September 4, 2013, at the Urbina home. (Ex. 1.) The clips showed Defendant Macias and another individual arrive at the home of Sergio Urbina in a brown Chevrolet pickup. *Id*. The clips further showed Defendant Macias enter the home of Mr. Urbina

1

and showed Mr. Urbina opening the passenger side door of a black Chrysler 300 and crouching next to it. *Id*. The clip then shows Defendant Macias leaving in the black Chrysler 300 and another man leaving in the brown Chevrolet pickup. *Id.*

Lieutenant Curtis Bitz, at the time an agent with DPS, testified that he observed these clips while conducting his investigation into Mr. Urbina, that he was presently able to identify the men as Mr. Urbina and Defendant Macias, and that he had concerns about Mr. Urbina crouching and reaching into the vehicle because Mr. Urbina was being investigated for distributing methamphetamine from the house. (Tr. at 14:10-17:11.) Lieutenant Bitz testified that, as a result of his concern, he called Officer Duren to get a patrol car to follow the vehicles he had observed and instructed him to get someone to follow them, and, if they could get a reason to get them stopped to get the identification of the drivers and any passengers of the vehicles. (Tr. at 17:12-24.)

At that time, then Patrol Deputy Mike Mitchell with the Anderson County Sheriff's Department testified that he received the radio communication from Officer Duren to conduct a traffic stop on either vehicle if "PC" was developed. (Tr. at 26:22-27:14.) After locating the vehicles, Officer Mitchell pulled over the brown Chevrolet pickup for failing to use a turn indicator, and stopped the truck in the Lowe's Home Improvement store parking lot. (Tr. at 27:21-28:6.) Officer Mitchell testified that a Mr. Olvera was driving the pickup and he did not have a driver's license. (Tr. at 28:7-17.) He further testified that because he did not have a license, it was normal practice to arrest him. (Tr. at 28:18-24.)

While conducting the traffic stop involving Mr. Olvera, Officer Mitchell testified that a black Chrysler 300 approached the scene, and the driver of the car, now identified as Defendant Macias, got out of the car and started walking towards him. (Tr. at 28:25-29:10.) Officer

Mitchell testified that he asked Defendant Macias to return to his vehicle a couple of times before Defendant Macias complied with his instruction. (Tr. at 29:7-19; 35:13-17.) Before retreating to the black Chrysler 300, Officer Mitchell testified that Defendant Macias was approximately 80 feet away from him. (Tr. at 35:21-23.) Officer Mitchell further testified that Defendant Macias was a large man and that he was concerned for his safety when Defendant Macias did not comply with his instructions to reenter the vehicle, so he therefore called for backup. (Tr. at 30:1-16.) Although Officer Mitchell testified that he had called for backup at that time, he also testified that Defendant Macias would have been free to leave at that point. (Tr. at 30:17-19; 37:9-12.)

Mr. Macias did not leave the scene and eventually backup arrived. Specifically, Investigator Lee Duren with the Anderson County Sheriff's Department arrived on the scene. Officer Duren testified that he had originally received the call from Lieutenant Bitz with the request to get a traffic stop on the black Chrysler 300 and a pickup truck to get an identification of the people. (Tr. at 41:8-22.) It was Officer Duren who then ultimately conveyed that request and provided the vehicle descriptions to Officer Mitchell. (Tr. at 42:2-43:5.) Officer Duren then testified that he later communicated with Officer Mitchell when he received a call for backup from Officer Mitchell because someone was approaching the scene of his traffic stop. (Tr. at 43:17-44:2.) Upon arriving at the scene, Officer Duren spoke with Officer Mitchell about the driver in the Chrysler 300 who had approached Officer Mitchell, and then approached Mr. Macias, who was leaning up against the vehicle, and asked for identification. (Tr. at 44:9-18.) Officers Mitchell and Duren testified that it is practice to identify an individual who appears at the scene of a traffic stop because of concerns for officer safety. (Tr. at 29:20-25; 45:23-46:9.) Mr. Macias then showed Officer Duren a small green card issued by Mexico that contained his

photo and name. (Tr. at 44:19-23.) Officer Duren testified that because he did not have a valid Texas driver's license or any identification issued by the United States government, it was in the best interest of the county to arrest the violator because they would have no way to confirm his identification and write a citation. (Tr. at 45:6-17.)

Upon arrest of Defendant Macias and Mr. Olvera, both the Chevrolet pickup truck and the Chrysler 300 were inventoried and towed pursuant to Anderson County policy. (Tr. at 46:10-47:6; 62:10-16.) Officers Mitchell, Duren, and Myers, all of Anderson County, testified that it is the policy of Anderson County to tow a vehicle upon arrest for safekeeping and public safety. (Tr. at 31:2-22; 46:13-47:6; 62:10-13.) Specifically, Officers Mitchell and Duren testified that it is the unwritten policy in Anderson County to inventory the vehicle before it is towed to protect the police from potential liability and to protect the property of the car owner. (Tr. at 31:6-13; 46:13-47:3.)

Officer Duren inventoried the Chevrolet pickup truck, while Officer Donnie Myers inventoried the Chrysler 300 driven by Defendant Macias. (Tr. at 46:10-12; 62:14-16.) Officer Myers testified that when he opened the door of the Chrysler 300 he smelled marijuana, but did not find any on an inventory search of the vehicle. (Tr. at 62:17-21.) Officer Myers further stated that he noticed the screws holding the glove compartment of the vehicle were stripped from the outside and that some paint was chipped. (Tr. at 63:9-16.) Officer Myers could also see a plastic cellophane bag inside the dash. (Tr. at 63:20-64:2.) He retrieved and inventoried that bag, and inside of that bag found a large sum of cash—over $8000. (Tr. at 63:23-64:11.) Officer Myers also testified that he found the title to the car, a 30-day permit for the registration of the vehicle in the name of Ashley Camacho, and a liability insurance card issued to Ashley Camacho. (Tr. at 64:12-65:14.) Officer Myers testified that he was also present later when the

drug dogs were brought in to conduct a dog sniff, and that he saw two dogs alert on the envelope containing the money collected from the Chrysler 300. (Tr. at 67:3-15.) Officer Myers testified he was also present to witness the interview of Defendant Macias by DPS agent Chris Baggett, who read Mr. Macias his Miranda rights and questioned him. (Tr. at 67:16-24.)

In the briefing, Defendant argued that the inventory search of the Chrysler 300 was illegal for two reasons: (1) because the vehicle was lawfully parked and should not have been towed or inventoried; and (2) the vehicle search was not in compliance with any written inventory search and it exceeded the scope of a lawful inventory search. (Doc. No. 268, at 2.) However, at the hearing, Defendant also raised the argument that he was unlawfully detained when he was asked for his identification. The Court will take up each of Defendants' arguments in turn based on the evidence presented.

## **LEGAL STANDARDS**

The Fourth Amendment permits officers to stop and question an individual, even without probable cause where they have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1 (1968). As to reasonable suspicion, the Fifth Circuit has explained as follows:

> Our assessment of reasonable suspicion is based on the totality of the circumstances. Furthermore, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation. The collective knowledge theory for reasonable suspicion applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts.

*United States v. Powell,* 732 F.3d 361, 369 (5th Cir. 2013).

The Fourth Amendment also protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are 'per se unreasonable unless they fall within a few narrowly defined exceptions.'" *United States v. Kelly,* 302 F.3d 291, 293 (5th Cir. 2002). One such exception that courts have recognized is the "community caretaking" exception. *See United States v. Castro,* 166 F.3d 728, 734 (5th Cir. 1999) (en banc); *United States v. Smith,* 522 F.3d 305, 315 (3d Cir. 2008); *United States v. Proctor,* 489 F.3d 1348, 1353 (D.C. Cir. 2007); *United States v. Coccia,* 446 F.3d 233, 239 (1st Cir. 2006); *United States v. Petty,* 367 F.3d 1009, 1012 (8th Cir. 2004). Exemplary of this exception are impoundments by the police in furtherance of "public safety" or "community caretaking functions," such as removing "disabled or damaged vehicles," and "automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

Along these lines, inventory searches are excepted from the warrant requirement when they are not designed to uncover evidence of criminal activity, but conducted to serve "caretaking purposes," such as "to protect the owner's property while it is in police custody, to protect the police against claims of lost or stolen property, and to protect the police and the public from potential danger." *United States v. Andrews*, 22 F.3d 1328, 1334 (5th Cir. 1994). Inventory searches must be conducted according to standard regulations and procedures, consistent with the proper purpose of a noninvestigative inventory search. *Florida v. Wells*, 495 U.S. 1, 4–5 (1990); *Colorado v. Bertine*, 479 U.S. 367, 374 (1987); *United States v. Como*, 53 F.3d 87, 92 (5th Cir. 1995).

## ANALYSIS

### A. *Detainment and Reasonable Suspicion*

At the hearing, Defendant argued that there was no reasonable suspicion to detain him to ask for identification. As an initial matter, Officer Mitchell provided uncontroverted testimony that Defendant Macias was free to leave when he asked him to step back from the scene of his traffic stop of Mr. Olvera if he returned to his car. (Tr. at 30:17-20.) While it is somewhat counterintuitive that Officer Mitchell stated Mr. Macias was free to leave yet called for backup, Officer Mitchell testified that the reason he called for backup was because he did not know why Defendant Macias was approaching him and that he feared for his safety as he was a rather large man. (Tr. at 30:1-14; 35:13-17.) To the extent Defendant Macias would not have complied with Officer Mitchell's request, it is reasonable to believe that Officer Mitchell would have needed backup under the circumstances. Accordingly, the evidence shows that Defendant Macias was not detained at the time at which Officer Mitchell asked him to return to his vehicle. Indeed, Defendant Macias was unaware that Officer Mitchell had called for backup, and Officer Mitchell did not instruct Mr. Macias to remain in the vehicle. Defendant Macias arrived voluntarily at the scene, chose to pull over and approach Officer Mitchell, and at no point in time during this interaction was he handcuffed, searched, or otherwise restrained. Thus, the only question of improper detainment is whether Officer Duren, who arrived on the scene as backup, improperly detained Defendant Macias when he asked for his identification.

The government maintains that Officer Duren did not need a reasonable suspicion to ask Defendant Macias for identification because Defendant Macias was voluntarily at the scene and "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." (Doc. No. 284, at 2.) The Court agrees that the

request for identification by Officer Duren does not in and of itself constitute an improper detainment of Defendant Macias. The Supreme Court in *Royer* believed that an officer's request for identification and examination of identification documents did not by itself violate the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 501 (1983). Here, there was no dispute that Defendant Macias was voluntarily at the scene. Moreover, the evidence reflects that Defendant Macias offered an identification card to Officer Duren consensually. Thus, based on the evidence presented, Officer Duren's request to see Defendant Macias's driver's license does not by itself constitute an improper detainment under the Fourth Amendment.

At the point at which Officer Duren discovered Defendant Macias did not have a valid driver's license, there is no dispute that his arrest of Defendant Macias was legal. Aside from it being a jailable offense, Officer Duren testified that when an individual does not have a valid driver's license that it is in the county's best interest to place the individual in jail because there would be no way to issue a citation. (Tr. at 45:6-17.) Similarly, the government presented evidence that Defendant Macias had been picked up in Houston, Texas, and similarly jailed for driving without a valid driver's license. (Ex. 2.)

Even assuming that the scale of reasonable inquiry had shifted to a formal detainment in the time between Officer Duren's request to see identification and Defendant's arrest, here, Officer Duren had a reasonable suspicion for his actions. Upon arriving on the scene as backup, Officer Duren knew three critical pieces of information: (1) that the black Chrysler 300 that Defendant Macias was in fit the description of the vehicle Agent Bitz had described to him when he radioed for a patrol car (Tr. at 41:8-22); (2) that the black Chrysler 300 was consistent with the video surveillance tapes from Sergio Urbina's house that Officer Duren had already watched (Tr. at 41:23-42:1); and (3) that this was the individual who had approached Officer Mitchell

8

during the traffic stop that had caused Officer Mitchell to call for backup (Tr. at 43:17-44:16). These pieces of information that were unquestionably known to Officer Duren at the time he requested to see Defendant Macias's identification gave him reasonable suspicion to ask for said identification. *Powell,* 732 F.3d at 369 ("reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation."). Moreover, based on this knowledge, and Officer Duren's knowledge that Defendant Macias and a black Chrysler 300 had come from the home of an individual who was actively being investigated for methamphetamine distribution, Officer Duren's action in asking to see identification was reasonably related to the scope of the circumstances. *Id.*

### B. Tow and Inventory Search

Defendant next contests that the towing and inventory search of the Chrysler 300 were improper. (Doc. No. 268, at 2.) Indisputably, Officers Duren and Myers had no warrant to search either the Chrysler 300 or the Chevrolet pickup. However, both towing a vehicle and conducting an inventory search are known exceptions to the warrant requirement. *Opperman*, 428 U.S. at 369; *Andrews*, 22 F.3d at 1334.

Here, Officers Duren, Mitchell, and Myers all testified that it is the policy of the Anderson Country Sherriff's Department to tow a vehicle after the driver has been arrested. (Tr. at 31:2-22; 46:13-47:6; 62:10-13.) The vehicle in question was parked at Lowe's parking lot, which is open to the public. Officer Mitchell testified that the vehicle would not have been left at Lowe's because it could have been damaged or stolen and created a potential nuisance to the public. (Tr. at 31:14-22.) Moreover, because Defendant Macias did not have a valid driver's license, there was no one present to drive the vehicle offsite. In addition, Defendant Macias was unable to present Officer Duren with any valid form of identification through which the officers

could have possibly contacted a family member or other individual to remove the car. Because the vehicle in question was parked in a public area, and there was no one present to drive it off, or anyone who could be reasonably tracked down, the towing of the vehicle was not an improper seizure. *See, e.g., United States v. McKinnon*, 681 F.3d 203, 208–09 (5th Cir. 2012) (finding that a police officer's decision to impound a vehicle was reasonable under the Fourth Amendment where the vehicle was parked in a public place and could have become a nuisance, and the vehicle could not be lawfully driven away from the scene).

Similarly, the Court finds the inventory search was not improper here. All three officers testified that Anderson County has an unwritten policy to inventory a vehicle being towed. (Tr. at 31:2-22; 46:13-47:6; 62:10-13.) Officers Duren and Mitchell both explained that, pursuant to the unwritten policy, the vehicle will be inventoried on site to protect the police from liability and to protect the property of the owner of the car. (Tr. at 31:6-13; 46:13-47:3.) Thus, the evidence presented established that an inventory policy exists in Anderson County and that it serves a valid purpose to protect the potential liability of the police department and the property of the owner. Based on similar circumstances, in *Walker*, the Fifth Circuit found that where it was established that an unwritten policy existed, and the policy existed to protect the property of the individual and reduce the potential liability of the police department, the inventory search conducted was not illegal. *United States v. Walker*, 931 F.2d 1066, 1068–69 (5th Cir. 1991). Here, because the evidence established that an inventory policy existed for a valid purpose, the Court finds that the inventory search was not improper.

At the hearing, the government proffered additional evidence that the totality of the circumstances would have been sufficient to create probable cause for the search. However, having found the inventory search was proper, the Court need not address that argument at this

time. Moreover, it was not contested that the specific actions of Officer Duren in retrieving the bag while inventorying the car were somehow improper. Similarly, the Court finds no need to take up the government's standing argument at this time.

## **CONCLUSION**

For these reasons and having considered all of the evidence before it, the Court **DENIES** Defendant's Motion to Suppress Evidence (Doc. No. 268).

**It is SO ORDERED.**

**SIGNED this 28th day of January, 2016.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE